Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/08/2021 08:08 AM CDT

Thomas B. Whittle, M.D., appellant, v.
State of Nebraska Department of Health
and Human Services, Regulation and
Licensure, and State of Nebraska ex
rel. Douglas Peterson, Attorney
General, appellees.

___ N.W.2d ___

Filed July 16, 2021.    No. S-20-575.

1. **Administrative Law: Judgments: Appeal and Error.** A judgment or final order rendered by a district court in a judicial review under the Administrative Procedure Act, § 84-901 et seq. (Reissue 2014), may be reversed, vacated, or modified by an appellate court for errors appearing on the record.

2. ____: ____: ____. When reviewing an order of the district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Administrative Law: Judgments: Statutes: Appeal and Error.** To the extent that the meaning and interpretation of statutes and regulations are involved, questions of law are presented which an appellate court decides independently of the decision made by the court below.

4. **Administrative Law.** To be valid, a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated.

5. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Neb. Rev. Stat. § 44-2810 (Reissue 2010) of the Nebraska Hospital-Medical Liability Act requires an expert witness on medical malpractice to be familiar with the customary practice among medical professionals in the same or similar locality under like circumstances.

6. **Administrative Law: Records: Rules of Evidence: Judicial Notice: Appeal and Error.** In a de novo review on the record of an agency, the

record consists of the transcripts and bill of exceptions of the proceedings before the agency and facts capable of being judicially noticed pursuant to Neb. Evid. R. 201.

7. **Records: Appeal and Error.** A party's brief may not expand the evidentiary record on appeal.

8. **Administrative Law: Due Process: Notice: Evidence.** Procedural due process in an administrative proceeding requires notice, identification of the accuser, factual basis for the accusation, reasonable time and opportunity to present evidence concerning the accusation, and a hearing before an impartial board.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

James A. Snowden and Elizabeth Ryan Cano, of Wolfe, Snowden, Hurd, Ahl, Sitzmann, Tannehill & Hahn, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, Mindy L. Lester, and Milissa Johnson-Wiles for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

The State brought disciplinary charges against Thomas B. Whittle, M.D., alleging that he practiced medicine in a pattern of incompetence and negligence and that he committed acts of unprofessional conduct. Following a hearing, the chief medical officer of the Division of Public Health for the Department of Health and Human Services (the Department) suspended Whittle's license to practice medicine for 6 months. Whittle sought judicial review. The district court for Lancaster County, on de novo review, found that Whittle had over diagnosed and over treated patients and otherwise engaged in a pattern of incompetent or negligent conduct and practiced outside the standard of care. It found that the conclusions of

law reached by the Department were correct and affirmed the sanction. Whittle appeals. He asserts that the regulation under which he was found to have engaged in unprofessional conduct is invalid, and he further asserts that the agency and the district court applied an incorrect standard of care, that the proceedings were interjected with religious animus, that evidentiary rulings at both the administrative level and the district court amounted to reversible error, and that he was denied due process. We determine that none of Whittle's claims have merit and, accordingly, affirm.

## II. STATEMENT OF FACTS

Whittle is a physician who practices vascular medicine, including surgery, in Lincoln, Lancaster County, Nebraska. He also operated a venous medicine practice in Omaha, Nebraska.

### 1. Procedural Background

The "Petition for Disciplinary Action" filed by the State against Whittle on July 3, 2017, set forth two causes of action for discipline relevant to this appeal: (1) the practice of the profession in a pattern of negligent conduct, in violation of Neb. Rev. Stat. § 38-178(6)(d) (Reissue 2016), and (2) the practice of the profession outside the acceptable and prevailing standard of care (unprofessional conduct), in violation of § 38-178(23), Neb. Rev. Stat. § 38-179(15) (Reissue 2016), and 172 Neb. Admin. Code, ch. 88, § 010.02(32) (2013). The State also alleged that Whittle failed to keep and maintain adequate records.

Whittle filed a motion to dismiss, a motion to disqualify, and a motion to strike. The administrative order found that the motions, at best, pertained to the credibility of witnesses, not admissibility, and that Whittle's arguments did not support dismissal of the case or exclusion of evidence.

A 16-day administrative hearing was held between May 2018 and February 2019. One of Whittle's former patients testified. The State's designated expert, Thomas Webb, a board-certified vascular surgeon, testified that he reviewed

the medical records of a sampling of Whittle's patients, which we will refer to as "Patients A through I," and provided an expert opinion that Whittle was outside the standard of care in their treatment. Webb is the director of vascular surgery for Cardiac Surgery Associates/Franciscan, and prior to moving to Indiana, he practiced vascular medicine in Nebraska as the director of vascular surgery at Bergan Mercy Hospital from 2000 to 2014. Stephen Torpy, Scott Wattenhoffer, and Timothy Baxter, Nebraska-area physicians who provided care to patients after they had been treated by Whittle, also testified at the hearing. Whittle and his expert witnesses, Patricia Thorpe and David Gillespie, who are physicians, testified on Whittle's behalf. Thorpe and Gillespie testified generally that no procedure performed by Whittle was outside the standard of care, although in some cases, they would have treated patients differently.

Following the hearing, the Department concluded that the State had proved that Whittle had committed a pattern of incompetent or negligent conduct and departed from the standard of care by (1) over diagnosing eight patients (Patients A through H) and (2) over treating seven patients (Patients A through C, Patients E through G, and Patient I). It found that the State had not carried its burden to show that Whittle failed to keep and maintain adequate records. The Department ordered that Whittle's license to practice medicine be suspended for 6 months; required him to complete an evaluation to assess his competency to treat patients with venous disease; and required him to attend an approved course on "over-diagnosis, over-treatment and evidence-based medical practice."

In its order, the Department found that the evidence "supports a finding by clear and convincing evidence that [Whittle] regularly over-diagnosed patients with venous disease without reference to objective symptoms, physical examinations, or diagnostic tests. In addition, [Whittle] maintained a practice in which he excessively widened disease definitions through use of 'working diagnoses' and flawed methodology." The order

also concluded that Whittle had over treated Patients A, E, and G because he failed to order adequate trials of conservative therapy.

Whittle sought review of his discipline in the district court under the Administrative Procedure Act. See Neb. Rev. Stat. § 84-901 et seq. (Reissue 2014). Whittle offered briefs into evidence, since they had been submitted in lieu of argument, but the district court refused to admit the briefs. Turning to the substance of the appeal, the district court determined that Whittle received due process by the Department and that the witnesses for the State did not have economic or professional conflicts of interest, an appearance of bias, or religious animus. It found that evidentiary errors, if any, were harmless. Following a de novo review, the district court found that the legal conclusions reached by the Department were correct, that discipline was appropriate, and that suspension of Whittle's credential to practice medicine for a period of 6 months was an appropriate sanction.

## 2. Medical Definitions

The administrative order set forth the following definitions of medical terminology, which are helpful for understanding the charges in this case:

• CEAP score is a classification tool used in vascular medicine that assists a physician in objectively describing the pathology and severity of a patient's venous disease. "C" stands for clinical examination, "E" for etiology, "A" for assessment, and "P" for pathology. The basic CEAP score ranges from 0 to 6, with 0 being no venous disease and 6 being the most severe venous disease.

• Chronic venous insufficiency is a condition that occurs when the venous wall and/or valves are not working effectively, making it difficult for blood to return to the heart from the lungs. Commonly, venous insufficiency is caused by faulty valves in the veins, which results in reflux of blood in the veins.

- Vein coil is a device that is inserted into a vein that causes clotting and seals faulty veins.
- Common iliac veins are veins that connect to the external iliac veins and internal iliac veins. They are located in the abdomen and drain blood from the pelvis and lower limbs.
- Iliocaval confluence is the junction between the common iliac veins and the inferior vena cava.
- Intravascular ultrasound (IVUS) is a surgical diagnostic technique in which an ultrasound device attached to a catheter is inserted into a blood vessel for diagnostic and treatment purposes and is used for, among other purposes, placement of stents, coils, and plugs.
- Jailing refers to iliac vein occlusion associated with extension of a stent into the iliocaval confluence that prevents future access into the vein during reintervention or thrombosis (formation of blood clot) of the right-sided vein (right common iliac vein). Jailing occurs in approximately 1 percent of patients.
- May-Thurner syndrome is a venous disease related to the compression of the left common iliac vein caused by external compression by the right common iliac artery, which results in symptoms in the left leg. It is also referred to as "iliac vein compression."
- Pelvic congestion syndrome is pain and other symptoms caused by dilation of pelvic veins. Most patients with pelvic congestion have fullness or heaviness in the pelvis and achiness while sitting or standing.
- Perforators are veins connecting superficial veins and deep veins.
- Vein stent is a metal mesh tube that is inserted into a vein and expands against blocked or narrowed vein walls and acts to keep the vein open.
- Transvaginal ultrasound is a surgical diagnostic technique in which an ultrasound device is inserted in a patient's vagina to image the internal aspects of the pelvis, including a patient's veins.

• <u>Venography</u> is a diagnostic technique which uses x rays and contrast material injected into a vein to show blood flow and potential reflux.

### 3. Whittle's Treatment

Facts related to Patients A through I are set forth below:

### (a) Patient A

In March 2016, Patient A, a 41-year-old woman, presented to Whittle with complaints of varicose veins; pain in her right hip, buttock, and leg; and aching and cramping in her calf. She had previously used compression stockings for a short period of time in 2001, but had not used them since.

On physical examination, Whittle observed varicose veins in the left leg and spider veins. He did not find edema. In the right leg, Whittle observed pigmentation, shiny atrophic skin, large ropy varicose veins in the calf, and swelling extending up to the midcalf. He did not document inflammation or swelling of either leg. A noninvasive ultrasound examination known as a duplex scan was performed on both legs. The scan of the right leg showed severe reflux in the great saphenous vein, which runs inside the surface of the leg from the ankle to the groin; the examination found no significant reflux in the right small saphenous vein, which runs from the ankle to the calf, and found ropy varicose veins in the calf. The scan showed that the left leg had mild reflux throughout the left saphenous vein, but no reflux in the left anterior accessory vein (a vein that connects to the great saphenous vein) or in the small saphenous veins. Whittle concluded that Patient A had a CEAP score of 4 for her right leg and a CEAP score of 1 in her left leg. The CEAP score of 1 indicated that there was not inflammation in the left leg. Whittle diagnosed Patient A with secondary lymphedema, which is fluid buildup due to a secondary cause; chronic venous hypertension with inflammation involving both sides; vein compression; lower limb vessel anomaly; and varicose veins of the lower extremity with inflammation in the

right extremity. Whittle recommended a transvaginal ultrasound to assess pelvic vein pathology.

Five days later, Whittle conducted a transvaginal ultrasound and venography on Patient A. The procedure revealed internal iliac veins, which Whittle described as severely enlarged, and severely enlarged ropy pelvic varicosities, which were worse on the left side. He noted a possible fibroid in the uterus and a follicular cyst in the right ovary. Based on the findings of the transvaginal ultrasound, Whittle diagnosed Patient A with lower limb vessel anomaly, varicose veins of the lower right extremity with inflammation, vein compression, and chronic venous hypertension with inflammation involving both sides. The medical record noted that Whittle recommended a venogram and IVUS to investigate and treat and that stents, plugs, and/or coils would be used as needed to treat the problems found during the venogram and IVUS. Whittle also recommended that Patient A continue wearing medical grade compression stockings.

In April 2016, Whittle conducted a venogram and IVUS. He (1) coil embolized Patient A's right and left ovarian vein to block blood vessels, (2) inserted "double barrel" stents in each of the common iliac veins, and (3) placed plugs in the main trunk of the internal iliac vein bilaterally.

The State's expert witness, Webb, testified that there was no basis for the diagnosis of chronic venous hypertension in *both* legs. In its order, the Department found that the diagnosis of "venous hypertension with inflammation involving both sides" was not supported by medical evidence and was not correct. It found that the April 2016 treatment failed to meet the applicable standard of care because Whittle failed to require an adequate trial of conservative therapy with compression stockings or other methods prior to proceeding with invasive diagnostic tools and surgery. Patient A had a CEAP score of 1 on her left side, which meant she had minimal symptoms or findings. Although she had a higher CEAP score on her right side, the right iliac vein compression was less than 30

percent. There was no indication of compression or occlusion in the area where the right and left iliac veins connect. The Department found that the applicable standard of care requires that no stenting be placed under such circumstances and that Whittle failed to meet the applicable standard of care.

The Department also found that the embolizations and placement of plugs by Whittle in Patient A's ovarian veins and internal iliac vein failed to meet the applicable standard of care, which requires that, prior to treating suspected venous insufficiency in the pelvis, a physician must identify a connection with the internal iliac veins on the right or left venous system. With respect to identifying the tributaries to internal iliac veins, Webb explained:

[T]hink of the internal iliac veins as a main trunk. And you have . . . branches and twigs, and these branches or twigs are in the pelvis, and one of these branches goes . . . to the leg over here.

So if you don't obliterate that branch and you block this, have you helped that leg? Absolutely not. Because you still have inflow from the artery into the venous network.

Unless you've taken care of that branch that you've identified to the leg, you can still reflux to that leg.

On May 10, 2016, 11 days after Whittle inserted stents, embolizations, and plugs, Patient A developed an intraabdominal bleed for which she required hospitalization.

Baxter, Patient A's subsequent treating vascular surgeon, testified that the internal abdominal bleeding was caused by either the coils or the plugs inserted by Whittle. He testified that Whittle's explanation for the bleeding was not plausible. Gillespie testified that it "would be hard to justify" stent placement on Patient A's left leg.

(b) Patient B

Patient B, a 36-year-old woman, presented to Whittle in October 2015 with leg pain and varicose veins. She had a

16-year history of visible varicose veins and symptoms that included aching, swelling, tired, and heavy legs, as well as soreness to the touch in her legs. She denied having pelvic symptoms. In 2009, an endovenous ablation (cauterization and closure) of her right and left greater saphenous veins was performed. Conservative efforts had been attempted at some time in the past.

A duplex ultrasound of both lower extremities showed reflux in Patient B's greater saphenous vein in her right calf and reflux in her left greater saphenous vein and left anterior accessory saphenous vein. Whittle did not study the pelvic veins. Whittle diagnosed Patient B with vein compression, lower limb vessel anomaly, chronic venous hypertension with inflammation involving both sides, and varicose veins of lower limb with inflammation. Whittle noted in Patient B's medical record that she was experiencing multiple severe symptoms of venous insufficiency and recommended a venogram and IVUS to investigate and treat areas, including the pelvic region. He also gave Patient B a prescription for compression stockings "to begin conservative treatment."

In April 2016, Patient B reported increased soreness in her legs despite conservative efforts. She denied having pelvic symptoms. A venography with a bilateral groin approach was scheduled. Whittle performed a venogram and IVUS of Patient B's gonadal veins and placed bilateral common iliac vein stents despite the absence of iliocaval confluence involvement and the absence of a significant right common iliac vein compression.

The Department found that Whittle's initial diagnoses of vein compression and lower limb vessel anomaly were not supported by physical findings or ultrasound findings. It found the decision to perform IVUS and venography on Patient B's pelvic region failed to meet the applicable standard of care because (1) her pelvis had not been imaged and there had been no evidence of atypical veins in the groin, thigh, buttocks, or genital area and (2) Patient B reported no symptoms in her

pelvic area. It found that placement of stents failed to meet the applicable standard of care because there were no pelvic collaterals and tributaries refluxing into the leg to support a diagnosis of pelvic insufficiency or pelvic congestion syndrome. It found that Whittle's theory that a pelvic venous pathology existed was not supported by evidence-based medical practice or medical literature and that there was no medical indication for placement of a stent in the left common iliac vein because no pelvic collaterals or tributaries were identified on venography to support a diagnosis of pelvic venous insufficiency such as would cause Patient B's leg complaints.

Patient B did not improve following the treatment with Whittle, and she sought a second opinion from Wattenhofer. Wattenhofer testified at the hearing that Whittle's placement of stents was not medically indicated and did not meet the applicable standard of care.

### (c) Patient C

Patient C, a 54-year-old woman, was treated by Whittle in 2012 for injection sclerotherapy and endovenous ablation of her great and small saphenous veins. These treatments are methods of closing veins. She returned to Whittle in September 2014 complaining of red patches on her ankle areas. The patches were worse on the right ankle. She denied pain, swelling, achiness, or heaviness. On physical examination, Patient C showed spider veins and reticular veins without edema or varicose veins. Whittle noted that "[e]ssentially her legs are asymptomatic." Whittle performed a duplex ultrasound, which detected calf perforators with reflux and an isolated greater saphenous vein segment with reflux. The duplex ultrasound showed no significant reflux in the greater saphenous veins or in the deep systems bilaterally. Despite no finding of deep system reflux, a note in Patient C's medical record by a physician assistant stated that "given the recurrence of varicose veins, I'm suspicious that she harbors compressed iliac veins and anomalous lower extremity veins." Patient C was informed

of alternative conservative therapies, including compression stockings, physical activity, and weight loss. Whittle also recommended a venogram and IVUS for possible stenting, embolization, and ablation.

Whittle diagnosed Patient C with (1) chronic venous hypertension with inflammation, (2) anomalous lower extremity veins, (3) iliac vein compression, and (4) secondary lymphedema. At the administrative hearing, Webb testified that spider and reticular veins do not support a suspicion for compressed iliac veins or anomalous lower extremity veins. He explained that it was unlikely Patient C's skin redness was the result of venous disease.

Whittle performed a venogram and IVUS. He observed that the left common iliac vein had an outflow obstruction with only a 50-percent compression. He later stated, however, that the left common iliac vein "appears to be occluded with trickle flow getting into the inferior vena cava." Webb testified that a vein is "occluded" when it is completely blocked, which is inconsistent with imaging of Patient C showing a 50-percent compression.

During the IVUS, Whittle (1) placed a stent in Patient C's left common iliac vein, (2) performed two plug embolizations of hypogastric veins, and (3) performed a coil embolization and sclerotherapy on an enlarged left ovarian vein.

The Department found that the September 2014 diagnosis of anomalous lower extremity veins and iliac vein compression was not supported by either physical or ultrasound findings and that Whittle failed to meet the applicable standard of care. It found that the use of IVUS and venography failed to meet the applicable standard of care because Patient C had no symptoms or complaints, no preoperative imaging, and no clinical findings that warranted interventions. It found that Whittle's use of a stent, plug embolizations, and coil embolizations failed to meet the applicable standard of care because it was unnecessary and ineffectual, since Patient C had no pelvic

symptoms and treatment in the pelvis could not improve symptoms in her ankles.

After Whittle scheduled Patient C for more coiling and possibly more stents in her pelvic veins, Patient C sought a second opinion from Baxter. Baxter noted that the duplex ultrasound performed by Whittle did not show any significant reflux in Patient C's left side and did not warrant invasive diagnostic and treatment techniques for left common iliac vein compression.

### (d) Patient D

Patient D, a 33-year-old woman, was a previous patient of Whittle who returned in April 2015, complaining of swelling, tiredness, and heaviness in her legs, as well as symptoms consistent with restless leg syndrome. She did not complain of pelvic symptoms. The physical examination revealed no significant venous varicosities, but showed some amount of edema bilaterally. Patient D reported that she exercised regularly, elevated her legs in the evenings, and had worn compression stockings in the past. Whittle performed a venous duplex ultrasound showing reflux in Patient D's greater and small saphenous vein and a thickened valve cusp in the left femoral vein. Whittle diagnosed Patient D with vein compression, lower limb vessel anomaly, chronic venous hypertension with inflammation, varicose veins of the left lower extremity with inflammation, and secondary lymphedema. Whittle found she had a CEAP score of 3 bilaterally, indicating superficial venous disease. He recommended a venogram, an IVUS, and stents, plugs, and/or coils to treat the problems.

Patient D did not undergo the treatment recommended by Whittle and sought a second opinion from Torpy. Torpy determined that Patient D had a CEAP score of 2. Torpy ablated Patient D's great saphenous vein, and the treatment was successful. Patient D told Torpy that Whittle had diagnosed her with May-Thurner syndrome, but Torpy did not find any evidence of iliac vein compression. Torpy testified that Whittle's

treatment, diagnostics, and recommendations for Patient D failed to meet the standard of care in Nebraska.

Webb opined that a venogram and IVUS were not medically indicated for Patient D, noting that the 2015 duplex ultrasound was not greatly changed from a prior duplex ultrasound Whittle performed in 2013. The Department found that the April 2015 diagnosis of vein compression, recommendation to use a venogram and IVUS, and recommendation to use stents, plugs, and/or coils to treat issues in Patient D's pelvic veins failed to meet the applicable standard of care because the diagnoses of vein compression and lower limb vessel anomaly were not supported by physical findings, duplex ultrasound findings, or other medical evidence.

### (e) Patient E

Patient E, a 51-year-old woman, presented to Whittle in October 2013 with complaints of left hip, thigh, and groin pain. The medical record shows that Patient E was suffering from leg pain, aching, cramping at night, and swelling, as well as tired and heavy legs, with symptoms in the left leg being worse than in her right. However, at the hearing, Patient E denied having such symptoms. Patient E reported that she exercised regularly, elevated her legs in the evening, and had worn compression stockings for about a week after surgeries. She reported pelvic pain and heaviness, vulvar varicosities, painful intercourse, hemorrhoids, bladder spasms, and a history of polycystic ovaries. She previously had three laparoscopic surgeries in her pelvis, all related to cystic ovaries.

Whittle performed a venous duplex ultrasound, which showed reflux in a perforator vein in Patient E's left calf. Whittle diagnosed pelvic congestion syndrome, chronic venous hypertension with inflammation, varicose veins of the left lower extremity with inflammation, and "heterozygous factor V leiden mutation." He recommended a venogram and IVUS of the abdomen and pelvis, with a possible angioplasty and insertion of stents.

Whittle performed a venogram and IVUS on Patient E. He placed stents in several veins and identified a 90-percent stenosis in the left common iliac vein. He investigated hypogastric veins and ovarian veins and noted only mild reflux in the left hypogastric vein, no reflux in the right hypogastric vein, and no reflux in either ovarian vein.

Patient E's pain continued to increase. She returned to Whittle in June 2014, complaining of pain in her bilateral hips, radiating to her thighs and buttocks. Whittle performed a transvaginal ultrasound and revealed hypogastric veins on each side which were normal. Nonetheless, Whittle found that Patient E had "[a]nomalous enlarged hypogastric veins noted bilaterally." He recommended a repeat IVUS and venography to examine the pelvic veins and to use stents, plugs, and/or coils to treat any problems.

Whittle performed the repeat IVUS in August 2014. The sizes of the hypogastric veins were not significantly enlarged or anomalous. There was no significant reflux in either ovarian vein. Despite the absence of reflux, Whittle performed a plug embolization of the origins of Patient E's hypogastric veins. Patient E recalled that she screamed because of the pain in her lower back during this round of procedures.

Webb testified that Patient E's gynecological diagnoses were likely the true etiology for her symptoms. Baxter testified the diagnoses by Whittle were not supported by the medical record or physical findings. The record is undisputed that approximately two-thirds of the millions of women who suffer from pelvic pain in the United States can attribute that pain to nonvenous etiology. Webb testified that he is not aware of another physician in Nebraska or anywhere else who would proceed to the procedures for Patient E in the same manner as Whittle.

The Department found that the October 2013 recommendation of a venogram and IVUS and a possible angioplasty and stents failed to meet the applicable standard of care because (1) Patient E's physical symptoms and the results of her duplex ultrasound findings did not support a diagnosis of pelvic

congestion syndrome, (2) Whittle's theory was not correct, and (3) Whittle had not attempted an adequate trial of conservative therapy given Patient E's clinical presentation. It found that the June 2014 recommendation of IVUS and venography for Patient E failed to meet the applicable standard of care because the same procedure had been conducted 9 months prior and a reasonable physician would not expect a change in a patient's vein status in such a short period of time and because there was no basis to recommend such intervention. With respect to the embolization of the hypogastric vein, the Department found this was not indicated based on Patient E's symptoms and clinical findings.

Patient E did not obtain clinical relief from the procedures. When the pain in her legs and behind her knees worsened, she sought a second opinion from two other physicians. Baxter testified that stents were unnecessary and that closing the veins was not within the standard of care.

(f) Patient F

Patient F, a 14-year-old girl, presented to Whittle in April 2013 with lower leg swelling and discoloration of her feet which had progressed during the previous 6 months. She had never worn compression stockings. A physical examination showed trace edema on both legs with discoloration of the feet up to the midshin area. A duplex ultrasound revealed reflux within the greater and small saphenous venous systems bilaterally. There was no significant reflux.

Whittle diagnosed Patient F with chronic venous hypertension with inflammation and recommended a trial of compression stockings for 3 to 6 months. He informed Patient F that if symptoms persisted, he would consider endovenous catheter ablation of the saphenous veins and vascular ultrasound assessment of her iliac veins.

In July 2013, Patient F returned for a followup appointment. She reported that she had worn compression stockings, "collectively for about a month," but the stockings were

uncomfortable and her feet were still purple, so she stopped wearing them. She requested that Whittle perform an IVUS. Physical examination revealed a red knee, bluish discoloration on both feet, and edema.

In August 2013, Whittle performed an IVUS and venography and noted that the inferior vena cava was occluded. Webb opined that this finding was not consistent with the imaging and was an "egregious" error. Whittle inserted bilateral stents, using a "double barrel" technique, into the common iliac vein.

Patient F's physical condition did not improve, and she developed significant back pain. She sought treatment from Baxter, who concluded, to a reasonable degree of medical certainty, that Patient E's severe back pain was caused by the stents. Baxter and Webb testified that the stents were too big for Patient F's veins. Further, the stents did not improve the bluish discoloration on Patient F's feet. The pain from the stents caused Patient F to take pain prescription medications, miss classes, and "eventually . . . homeschool." Baxter attempted to remove the "double barrel" stent placed by Whittle, but it was too big. He observed that "the stents were actually pushing into the wall to the point that they were just barely covered by any tissue. . . . I thought that if I tried to take those out, it would just destroy the [vein]." According to Baxter, the stents are likely to "come through the wall of the vein," which would necessitate additional surgery.

The Department found that the April 2013 diagnosis of Patient F with chronic venous hypertension with inflammation failed to meet the applicable standard of care because it was not supported by reported symptoms, physical findings, or duplex ultrasound results and was wrong. In fact, Patient F suffered from acrocyanosis, a benign, usually neurological disorder, which is not related to venous compression. Baxter testified that acrocyanosis is not an uncommon condition, especially among adolescent girls, and that the best treatment is simply reassuring the patient that the condition is benign. The Department found that the August 2013 operation also failed

to meet the applicable standard of care because Patient F's symptoms and diagnostic results did not support a pelvic cause of any venous disease.

### (g) Patient G

Patient G, a 59-year-old woman, presented to Whittle in July 2013 with a complaint of varicosities that had worsened over the previous decade. She reported symptoms of itching, burning, aching, cramping, fatigue, heaviness, and foot pain for 2 to 3 years. Additionally, she had pelvic heaviness and pain, bladder spasms, irritable bladder, painful intercourse, and crampy and bloated feelings. She had not worn compression stockings.

Whittle's physical examination showed spider veins on both of Patient G's thighs. She had edema showing minor swelling bilaterally. An ultrasound of Patient G's lower extremity showed an absence of reflux in the left or right greater saphenous vein and deep venous systems bilaterally. Whittle diagnosed Patient G with chronic venous hypertension with inflammation, pelvic congestion syndrome, and spider veins. Webb and Baxter testified that these diagnoses were not within the standard of care. Whittle recommended a venogram and IVUS, a possible angioplasty, and a possible stent.

Patient G sought a second opinion from Baxter, who recommended conservative therapy.

The Department found that the July 2013 diagnoses of pelvic vein compression and pelvic congestion syndrome failed to meet the applicable standard of care because they were not supported by history, physical findings, or a duplex ultrasound and were not correct. The recommendation of a venogram and IVUS failed to meet the applicable standard of care because conservative management with compression therapy was not offered prior to a recommendation of intervention.

### (h) Patient H

Patient H, a 49-year-old woman, presented to Whittle in February 2013 with complaints of chronic venous hypertension

and varicose veins for the previous 20 years. She had progressive throbbing, aching, heaviness, and pain in both legs; was fatigued; had pelvic pain after intercourse; and suffered from bladder and rectal spasms. She also complained of a persistent burning in her right calf. She had previously had surgeries to remove her uterus and ovaries. She had been wearing compression stockings for 6 years.

Whittle performed an ultrasound, which showed significant reflux in Patient H's right and left great saphenous veins, left anterior accessory saphenous vein, right posterior accessory saphenous vein, and right small saphenous vein. She also had varicosities in the thigh and calf of both legs. Whittle diagnosed her with pelvic congestion syndrome and chronic venous hypertension with inflammation, inflammation of a vein and vein inflammation causing a clot of the superficial vessels of her lower extremities, and swelling of a limb. He recommended a transvaginal ultrasonography, which was performed 2 days later. It showed that the vessels in Patient H's pelvic area were normal sized.

In Patient H's medical record, Whittle stated that the findings were "consistent with enlarged refluxing varicose veins of the pelvis . . . consistent with iliac outflow obstruction." Whittle recommended a venogram and IVUS and a possible angioplasty and/or stent placement. Webb testified that such a diagnosis was not supported by the evidence and was not within the standard of care. He explained that, in fact, the removal of the uterus and ovaries would have "dramatically lessen[ed] the likelihood of having pelvic congestion syndrome because you've obliterated most of the veins that are involved with that syndrome."

The Department found that Whittle's recommendation that Patient H proceed with venography and other procedures failed to meet the applicable standard of care because the reported symptoms and objective findings did not support a diagnosis of pelvic congestion syndrome. Patient H sought a second opinion from Baxter, who performed an MRI of her pelvis and

found that the pelvic veins were not enlarged. Baxter did not observe any evidence of pelvic congestion syndrome. He prescribed compression support stockings, which relieved some of her symptoms.

(i) Patient I

Patient I, a 47-year-old woman, presented to Whittle in October 2010 with complaints of calf pain and varicose veins in both legs with progressive throbbing, aching, heaviness, itching, tingling, and swelling throughout the day. Her pain was worse in her right leg than her left. She had no pelvic complaints. Whittle's physical examination revealed ropy varicose veins in the bilateral thighs and calves and minor edema. A duplex ultrasound showed superficial vein reflux in each lower extremity, no evidence of deep vein thrombosis on either side, and an enlarged lymph node on Patient I's right groin. There was no indication that the abdominal wall was examined. Whittle diagnosed Patient I with varicose veins of the lower extremities with inflammation and swelling of limbs. He concluded that she had a CEAP score of 4 bilaterally. He recommended endovenous ablation for both legs.

Patient I called Whittle's office and spoke with a member of his nursing staff about a potential pelvic scan. According to the nurse's note, the nurse "explained we would probably need her to come back for another office visit to document her symptoms" to support a magnetic resonance venography (MRV), because insurance criteria had "tightened on approving these MRV's but I assured her we would do what was needed to get the approval for the test."

In November 2010, Whittle performed an endovenous ablation on Patient I on both legs. The next day, he documented new pelvic pain and pain on intercourse by Patient I. He reported that her pelvic symptoms had been worsening over the past 2 to 3 years. His report stated that the ultrasound showed a large cluster of varicosities "which appear[] to originate along the lower abdominal wall and pelvis." He diagnosed

Patient I with pelvic congestion syndrome and recommended an MRV.

The MRV revealed reflux and enlargement of the ovarian veins, the left greater than the right; enlarged internal iliac vein branches; mild enlargement of the inferior vena cava; and some cysts. The MRV did not find compression of the inferior vena cava or either common iliac vein and no anomalous or enlarged internal iliac veins with reflux identified.

In December 2010, Whittle subsequently performed staged endovenous ablations on Patient I's greater saphenous veins. He then performed a venography of the ovarian veins. During this operation, he observed a vein refluxing and embolized it with a coil. Later in December 2010 and in April 2011, Whittle performed endovenous ablations on Patient I's lower extremities.

In October 2011, Patient I returned with complaints of persistent pelvic pain and throbbing radiating to her thighs bilaterally with the right being worse than the left. Whittle noted that Patient I "had an MRV scan prior to the coil embolization which demonstrates reflux in both ovarian veins and a suspicion for refluxing her internal iliac veins which are large." He recommended a repeat venography with possible coil embolizations of the pelvic veins. The new venography identified reflux in the right ovarian vein, and Whittle embolized the vein.

In March 2012, Patient I returned to Whittle complaining of pain and burning in her right calf and inflammation. A duplex ultrasound showed reflux in two right distal calf perforators and scattered secondary varicosities bilaterally. He recommended endovenous catheter ablation of the refluxing perforator segment. The ablation of the right calf perforators was performed in April 2012. Webb testified this ablation was not within the standard of care, because Patient I did not meet the criteria for ablation of her perforators.

In June 2014, Patient I returned to Whittle complaining of recurrent varicose veins and throbbing, achiness, and

heaviness beginning in the groin and extending into the thighs and calves. Whittle recommended intravascular ultrasound assessment of her iliac veins to look for outflow obstruction and assess her hypogastric veins for anomaly. He performed a venogram and IVUS and measured the hypogastric veins as within a range shown to be normal by the State. Whittle described the left vein as having severe reflux, stagnation of flow, and a left-to-right crossover flow. He described the right hypogastric vein as having absent valve function, stagnation of flow, and right-to-left crossover flow. The crossover flow did not relate to any of Patient I's symptoms, but nonetheless, Whittle inserted "double barrel" stenting to the common iliac veins and plugged the origins of the hypogastric veins. Webb testified that plugging the internal iliac veins was not medically indicated. Baxter testified that Patient I's iliac vein had not collapsed and that there was no reason to insert a stent.

The Department found that the April 2012 ablation of Patient I's perforators failed to meet the applicable standard of care in that her clinical findings did not warrant surgical intervention. It found that the July 2014 embolization of the hypogastric veins was not medically indicated and failed to meet the applicable standard of care.

### 4. Sanctions

The administrative order found that Whittle's over diagnoses and over treatment resulted in his patients' undergoing numerous unnecessary and unwarranted invasive diagnostic tests and surgeries and that "the violations of his professional duties are clear and significant." It found that given the large number of patients affected by Whittle's pattern of negligent and unprofessional conduct, suspension was appropriate. Several mitigating factors supporting suspension rather than revocation included Whittle's cooperation with the Department and that he was otherwise fit to practice medicine.

In affirming the sanction imposed by the Department, the district court agreed that Whittle was fit to practice medicine, but found that the nature of the offenses, the need for

deterrence, the maintenance of the reputation of the profession, and the attitude of the offender "more than adequately" supported the sanction. The court found, inter alia, that Patients E and F suffered pain because Whittle performed procedures not medically indicated and that Patients A through C and G underwent invasive, unnecessary procedures. The court determined that the 6-month suspension that Whittle received did not shock the conscience and that disciplining a physician for misconduct is related to the legitimate governmental interest of public health and welfare.

Whittle appeals.

## III. ASSIGNMENTS OF ERROR

Whittle claims, summarized and restated, that he was disciplined under an invalid regulation, that the Department and the district court applied the incorrect standard of care, that the proceedings were interjected with religious animus, that certain evidentiary rulings were incorrect, and that he was denied due process.

## IV. STANDARDS OF REVIEW

[1,2] A judgment or final order rendered by a district court in a judicial review pursuant to the Administrative Procedure Act may be reversed, vacated, or modified by an appellate court for errors appearing on the record. *Swicord v. Police Stds. Adv. Council, ante* p. 43, 958 N.W.2d 388 (2021). When reviewing an order of the district court under the Administrative Procedure Act for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Swicord, supra*.

[3] To the extent that the meaning and interpretation of statutes and regulations are involved, questions of law are presented which an appellate court decides independently of the decision made by the court below. *McManus Enters. v. Nebraska Liquor Control Comm.*, 303 Neb. 56, 926 N.W.2d 660 (2019).

## V. ANALYSIS

### 1. Valid Exercise of Regulatory Authority

Whittle's principal claim concerns the standard of care that was applied in this disciplinary proceeding by the Department and the district court. Whittle claims that he belongs to a national school of thought in medicine which favors more aggressive venous interventions, but which is disfavored by local practitioners. Whittle claims that 172 Neb. Admin. Code, ch. 88, § 010.02(32) (2013), which he was found to have violated, is invalid because its standard of care is established by reference to practice in the State of Nebraska, not a national standard, and in so providing, he claims the regulation is inconsistent with and impermissible under Nebraska's Uniform Credentialing Act, see Neb. Rev. Stat. § 38-101 et seq. (Reissue 2016). We conclude that the Department possessed authority under § 38-179(15) to define acts of unprofessional conduct and that § 010.02(32) did not impermissibly modify, alter, or enlarge portions of its enabling statute. Thus, Whittle's violations were found to have occurred under a proper regulation.

We first set forth the statutory and regulatory framework behind the regulation which Whittle challenges. The Uniform Credentialing Act provides that a credential to practice a profession may be denied, refused renewal, or have other disciplinary measures taken under one or more of 24 bases, including, as relevant here, "(6) Practice of the profession . . . (d) in a pattern of incompetent or negligent conduct; . . . (23) Unprofessional conduct as defined in section 38-179." § 38-178.

Unprofessional conduct, as defined by statute, "means any departure from or failure to conform to the standards of acceptable and prevailing practice of medicine and surgery or the ethics of the profession, regardless of whether a person, patient, or entity is injured." Neb. Rev. Stat. § 38-2021 (Reissue 2016). See, also, § 38-179. Unprofessional conduct includes "[f]ailure to comply with any federal, state, or municipal

. . . regulation that pertains to the applicable profession," and "[s]uch other acts as may be defined in rules and regulations." § 38-179(13) and (15).

Turning to the regulations in effect at the time of the hearing, § 88-010.02(32) defined unprofessional conduct to include "[c]onduct or practice outside the normal standard of care in the State of Nebraska which is or might be harmful or dangerous to the health of the patient or the public, not to include a single act of ordinary negligence." The rule in effect between July 29, 2004, and December 15, 2013, similarly defined unprofessional conduct to include "[a]ny conduct or practice outside the normal standard of care in the State of Nebraska which is or might be harmful or dangerous to the health of the patient or public." 172 Neb. Admin. Code, ch. 88, § 013(21) (2004).

Whittle challenges the correctness of the regulation's phrase "the normal standard of care in the State of Nebraska." He claims the phrase is inconsistent with Nebraska's Uniform Credentialing Act and is invalid. He argues that the effect of the regulation is to establish a "majoritarian rule" among medical professionals in Nebraska, brief for appellant at 24, which results in punishment for physicians using less conservative approaches than those employed by a majority of practitioners in Nebraska. We reject Whittle's challenge.

[4] To be valid, a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated. *Mahnke v. State*, 276 Neb. 57, 751 N.W.2d 635 (2008). We believe the phrase "[c]onduct or practice outside the normal standard of care in the State of Nebraska" in the challenged regulation is not inconsistent with § 38-179. Section 38-179 explicitly authorizes the Department to define the bases of unprofessional conduct to supplement those enumerated in § 38-179(13) and (15). Section 38-179 does not provide a definition of "standards of acceptable and prevailing practice," much less one at odds with that provided by the Department in § 010.02(32).

Whittle relies heavily on *Mahnke, supra*, in support of his contention that § 010.02(32) is invalid. Whittle's challenge compares unfavorably with *Mahnke*, in which we invalidated a prior version of the same regulation to the extent it could be interpreted to permit discipline for a single act of ordinary negligence. The problem with the regulation as it was written at the time *Mahnke* was under consideration was that it created a basis to discipline a professional who had committed a single act of unprofessional conduct and therefore directly contradicted the language of the enabling statute, Neb. Rev. Stat. § 71-147 (Reissue 2003), which then permitted the State, as it does now, the power to impose discipline based on "a pattern of negligent conduct." Cf. § 013(21). Under the statutory definition requiring "a pattern," a professional could not be disciplined for a single act of ordinary negligence, and we found that the regulation in question was invalid because its provision permitted discipline based on a single act of negligence which was directly inconsistent with the statute under which it was promulgated.

In contrast to *Mahnke*, the regulation at issue here, § 010.02(32), is not inconsistent with the language of the authorizing legislation, and in fact, the statutes specifically authorize the Department to create regulations describing acts of unprofessional conduct. See § 38-179. The "normal standard of care in the State of Nebraska" in the regulation is not in excess of the enabling legislation. We conclude the regulation is valid.

[5] Our conclusion that the regulation is valid is harmonious and compatible with Nebraska malpractice legislation found elsewhere in the statutes. Under § 38-179(13), unprofessional conduct includes "failure to comply with any federal, state, or municipal . . . regulation that pertains to the applicable profession." In this regard, we note the regulatory similarities between "the normal standard of care in the State of Nebraska" described in § 010.02(32) and the locality rule adopted by the Legislature in the Nebraska Hospital-Medical Liability

Act for medical-negligence actions involving applicable health care providers. Neb. Rev. Stat. § 44-2810 (Reissue 2010). The Nebraska Hospital-Medical Liability Act requires an expert witness on medical malpractice to be familiar with the customary practice among medical professionals in the same or similar locality under like circumstances. See, § 44-2810; *Bank v. Mickels*, 302 Neb. 1009, 926 N.W.2d 97 (2019). Our conclusion that § 010.02(32) is valid is supported by the enabling legislation and consistent and harmonious with our medical malpractice jurisprudence and legislative scheme. Whittle's assignment of error challenging the validity of the regulation is without merit.

## 2. Treatment Was Outside Normal Standard of Care

Whittle contends that the evidence did not support the discipline imposed and that in particular, this case would have had a different outcome under a different standard of care. These contentions are without merit. The Department and the district court considered Whittle's arguments regarding the standard of care and properly rejected them as do we. Further, even if we were to apply a national standard of care as Whittle urges, in light of the evidence, his argument would still be unavailing.

We have reviewed the record, and contrary to Whittle's assertion, there is testimony referencing the national standard of care, such as that of Webb and Baxter; the kind of testimony Whittle prefers was before the Department. And in this regard, we do not find Webb to be disqualified as a witness as Whittle suggests. But even in light of all the testimony, the Department found a universal and fundamental violation to the effect that Whittle had "abandoned a medical evidence-based practice." Such conduct violated national and Nebraska standards of care.

The Department and the district court considered and rejected Whittle's claims suggesting that his approaches

were on the vanguard of venous medicine nationwide. The Department found that "[c]ontrary to [Whittle's] assertion, this is not a case of a 'philosophical difference' between parties, where entrenched conservatives who do not understand modern medicine battle innovators who seek to advance new methods of diagnosis and treatment to proactively alleviate suffering in patients." The Department and the district court did not select between two reasonable approaches to venous medicine, because there was ample evidence that Whittle's over diagnosis and over treatment fell outside the standard of care regardless of how it is measured. The record supports the finding that Whittle "caused significant physical and emotional harm to his patients due to his actions, which caused patients to undergo unnecessary and invasive tests, treatments, and follow-ups." On our review for errors on the record, we conclude that the State's expert testimony and the evidence support the district court's conclusion that Whittle's actions warranted the discipline imposed by the Department.

### 3. The Disciplinary Proceedings Were Not Interjected With Religious Animus

Whittle claims that the disciplinary proceedings against him were fueled by religious animus and were not neutral as required by the Free Exercise Clause of the First Amendment. See *Masterpiece Cakeshop v. Colo. Civil Rights*, ___ U.S. ___, 138 S. Ct. 1719, 201 L. Ed. 2d (2018). We find this assignment of error to be without merit. Whittle's claim stems from the remarks in Webb's 17-page written report in which he stated:

> I am particularly offended by the previous fliers that he has distributed to the Omaha community including ". . . curing vascular disease through the hands of God . . ." and his current letter head [sic]: "Revealing God's love Through Excellence in Health Care[.]" Both statements seem to be far from the truth.

Whittle cross-examined Webb extensively at the hearing. Webb testified that his review of the case was not affected

by Whittle's religious beliefs and that the statements in his report were concerned with the second part of the issue, which was "excellence in healthcare," and also, "curing vascular disease," which were the more offensive issues. Webb made clear that he was not opposed to Whittle's beliefs. Webb testified he was not offended by Whittle's statements "at all unless they, in fact, do not provide excellent health care." Webb stated that Whittle's statements were of concern "after [he] saw what had happened to the patients['] care in these seven patients that I reviewed."

Whittle analogizes Webb's statements to the impermissible hostility toward religious beliefs in *Masterpiece Cakeshop, supra*, in which the U.S. Supreme Court found that the Colorado Civil Rights Commission did not give a baker neutral treatment, with members of the commission showing clear and impermissible hostility toward the baker's religious beliefs.

As the district court concluded, "[t]his case is nothing like *Masterpiece Cakeshop . . . .*" Even if one of the State's witnesses was offended with religious statements of Whittle's branding, the viewpoints were not espoused by the Department. During the hearings, the only reference to Whittle's religion was the material quoted above in Webb's report and Whittle's cross-examination of Webb. The record shows that the Department was neutral toward Whittle's religion or religious beliefs and allowed him to explore his concerns fully through cross-examination. The district court's consideration and resolution of Whittle's religious animus issue was not error. This assignment of error is without merit.

### 4. The District Court Properly Excluded Appellate Briefs

Whittle also claims that the district court erred when it did not admit the parties' briefs into evidence. Whittle urges admission, because he submitted hundreds of pages of briefing in lieu of oral argument, which would have been transcribed by a court reporter. The district court did not err.

[6,7] Section 84-917 provides that review by the district court "shall be conducted by the court without a jury on the record of the agency." We have noted that "'[i]n a de novo review on the record of an agency, the record consists of the transcripts and bill of exceptions of the proceedings before the agency and facts capable of being judicially noticed pursuant to Neb. Evid. R. 201.'" *Betterman v. Department of Motor Vehicles*, 273 Neb. 178, 188, 728 N.W.2d 570, 583 (2007). Accordingly, the Administrative Procedure Act does not authorize a district court's reviewing the decision of an administrative agency to receive additional evidence as urged by Whittle. See *Betterman, supra*. Simply put, a party's brief may not expand the evidentiary record on appeal. See *Clarke v. First Nat. Bank of Omaha*, 296 Neb. 632, 895 N.W.2d 284 (2017). The district court was not empowered to admit the briefs into evidence for the purpose urged by Whittle and did not err when it refused to receive the written argument into the record.

## 5. Whittle's Evidentiary Claims Are Meritless

Whittle makes various claims, inter alia, regarding evidentiary rulings, the competency of a witness, and an assertion that he was denied due process. With respect to the contention that the Department erroneously did not receive medical literature supporting his view of proper venous medicine, in the absence of an offer of proof and an identification of the material excluded, we find no error on the record. To the extent Whittle claims he was denied procedural due process because Webb in particular was, or appeared to be, biased or represented a conflict of interest, this claim is unsupported by the record. Whittle's claim is more properly addressed to credibility than admissibility. In this regard, we note that physicians other than Webb testified both favorably and unfavorably as to Whittle. So there were competing views available to the fact finder.

After extensive cross-examination, evidence showed that the Department's physicians were established in the area, had

more patients than they could accommodate, and were not direct competitors of Whittle. There is no evidence they benefited economically by the Department's decision to discipline Whittle for over diagnosis and over treatment.

[8] Procedural due process in an administrative proceeding requires "notice, identification of the accuser, factual basis for the accusation, reasonable time and opportunity to present evidence concerning the accusation, and a hearing before an impartial board." *Prokop v. Lower Loup NRD*, 302 Neb. 10, 29-30, 921 N.W.2d 375, 392 (2019). The record in this case exceeds 4,000 pages of testimony in addition to thousands of pages of exhibits. Whittle provided a vigorous defense to the State's charges, and the Department considered the defense in its order. The Department's order and the subsequent review by the district court show no error.

## VI. CONCLUSION

As explained above, the regulatory definition of unprofessional conduct in § 010.02(32) is consistent with the enabling and other statutes. The Department and the district court applied the proper standard of care. The proceedings were not interjected with religious animus. No evidentiary ruling resulted in reversible error, and Whittle was afforded due process. The professional discipline and sanction against Whittle are supported by evidence that Whittle over diagnosed and over treated numerous patients in his venous medicine practice. Finding no error on the record, we affirm the order of the district court which affirmed the 6-month suspension of Whittle's license to practice medicine.

Affirmed.